Good morning, Your Honors. May it please the Court, I'm Patrick Smith on behalf of the appellant in this case, Katie Yasharal. In this case, Your Honors, we have a person who's visiting the jail, not a person who's been arrested for an independent crime who is showing up at the jail and being subject to searches. What we have here is a person who not only, who has a different status even than a pre-arraignment detainee. She is certainly not a custody detainee except that she's being held in a detention setting by the deputies at this point in time that the search occurs. What happens here is that Katie Yasharal, as a member of a legal office, is there to interview somebody, and she has certain rights that inmates don't have. She has a right to bring things into the interview room to show her client, to reveal to her client, and to interview that client about certain things. She has no right to bring contraband or unauthorized documents. That's correct. Well, she has a right, Your Honor, to bring, she has a right not to pass them. In terms of, of course she doesn't have a right to bring things that are inherently illegal, of course. With regard to documents, if I want to bring in a newspaper or other documents related to the case, I can bring them with me, or a legal representative can, into the interview room. The question is, can they be passed to the inmate? And what we have here is a circumstance where she does not attempt at any time to pass anything to the inmate, and that's conceded. And we even have a conflict between the deputies in terms of what she did or what was said to each of the deputies. So what we have is a person who now is there, and she stopped leaving the location. And she stopped leaving the location, and we have essentially a search that is not a routine pat-down search that occurs in a custodial setting. It's not even a routine pat-down search that occurs in the context of a visitor coming into the jail or a legal representative coming into the jail. We have strictly an investigative search which occurs here. And the investigative search is based on false pretenses. It's based on factual inaccuracies and possibly misrepresentations. And I think I've gone through that in the brief, that we deal with what Sergeant Bonilla said. He specifically said that you were passing or possibly passing items to the inmate. And we know that is not true because Detective Sergeant or, excuse me, Officer Trujillo says that, no, that's not the case. I never told him that. I never saw her do anything like that. So what happens here is the question is, is Katie Yasherelle is searched? And so I think that in reading the brief since they were filed some time ago, I realized that perhaps what happened in the district court and in the briefs, there's something that really needs to be clarified, and that is this, is that the issue is not black and white that the district court considered. The district court considered, was it a pat-down or was it a strip search? And that was the decision that the court made. Now, I don't think it's that simple. I will tell the court it's my position that Katie Yasherelle was the subject of a physical strip search, a search that occurred that was no different than any strip search in any context. It wasn't necessarily done with the eyes, but it was done with the hands, which is arguably and I think conclusively more intrusive. Okay. Let's start with something here. Pat-down search doesn't require any suspicion in a jail, in a visitor to a jail situation, right? I would agree with that. Okay. A strip search in general terms does require reasonable suspicion. It does. All right. So here what you've got is something that basically starts off and was intended to be a pat-down search. As it turned out, it's a little bit more than a pat-down search and a little bit less than a strip search, unless you define a strip search by showing some slit of your midriff, which every teenager in Los Angeles appears to think is cool. And it is more intrusive than a normal pat-down because of the nature of her clothing. So here's kind of my proposition. I agree with you. It's not really black and white. It's a little fuzzy. But if you start in the proposition that a pat-down doesn't require any suspicion, and let's suppose this goes a bit beyond a pat-down but falls short of being a strip search, is there enough, either by virtue of her own attire and or by virtue of the officer's belief, based upon what he articulated, that they both asked to exchange unauthorized documents that she had visited an unusual number of times and unusually frequently and for an unusually long period of time, and therefore this visit may have been personal and, in officer's experience, personal visits are more likely to produce exchanges of contraband? Okay. So that's justified. I guess to finish my very long sentence, does that justify the extra? Okay. And, Judge Reimer, I think what the first thing I would say to Your Honor is that the assumption in the first part of your question, respectfully, is wrong. You indicated that it started out as a pat-down search. My position is that it did not start out as a pat-down search, and I think there's a lot of circumstantial evidence that it did not start out that way. And that circumstantial evidence is such that the women were brought there and they were bringing her into the bathroom. They were told to search this woman, the appellant, and they were asked to search her. And they were asked to. It's not clear in the records because in the deposition Deputy Mattis never said anything, and she said she didn't remember as to what type of search. It was just a search. So Deputy Mattis and the other female deputy were going into the bathroom with Katie Asharel when Sergeant Bonilla told them to remain outside. Now, I think realistically what happened was is they were told that they were going to look for contraband, which is a strip search, essentially, because they said it was either drugs or weapons or something like that. Now, I know contraband could also be unauthorized documents if you're passing them. They certainly aren't contraband if they're in your possession. So that said, the second thing is that, and I know the Court knows this rule, but I want to remind it that we have to look at the facts in the light most favorable to the appellant. So what happens here is that Trujillo, when he makes those statements that she visited in an amount that was longer than other paralegals or other legal representatives or that he had evidence that there was some personal nature to the visit, there's a couple things of that. One is that's disputed because we have in the excerpts of record the declaration of Maria Masias who states that I've been in that room, I've seen Officer Trujillo, because he's not a deputy, he's an employee, but I've seen Trujillo view people, visits longer than Ms. Yasherell and more often than Ms. Yasherell, or words to that effect. And so there's a genuine issue of material fact as to whether or not the justification occurs. Now, to get to the heart of the question with regard to is it, you know, it's in a gray area there. It's my position, and I've said it before and I do want to make it clear, that this was a strip search. The fact that it was done physically with the hands and that it was done under the clothing and that her vagina area was touched, her breasts were touched in the sense that there was a rim, the fingers were stuck inside of the bra all the way around, that that is in fact a physical strip search. Now, understanding Bell v. Wolfish and all of the questions or the balancing of that. Would you say that the law was not clearly established as to whether this was a strip search or pat-down search or what it was? No, I would say it's not, and here's why. There's two reasons. One is that in the sheriff's own manual, department policy manual, it defines, and that's at the excerpts of record 18 to 21, it defines a pat-down as the physical, quote, the physical patting of a person over the clothing. Secondly, it describes a strip search as removing or rearranging. This is some kind of in-between, a hybrid or it's not either one. Is the law clearly established on that subject? I think it is because if you look at the strip search definition, it says removed or rearranging some or all of the clothing to permit, it says, a visual inspection of the underclothing, breasts, buttocks, or genitalia. The fact that they were in a public place, in a hall. Now, the strip search is not a, you don't touch the people, you just observe them. Is that right? Well, it depends on the type of strip search. A visual strip search in the normal protocol is that they would have them bend over things, cough, lift on a female, lift their breasts, things like that. And they would view it, but they would physically search the clothing and they would do a visual search. Now, my position is that, okay, that's a strip search and it has a certain inherent intrusiveness about it in the sense that you're exposing intimate body parts. The physical nature of the search that occurred here, which was essentially going up her skirt, running their hands around her thighs, on her buttocks, under her dress, in her vaginal area, her skirt was lifted up, her hands were placed under the blouse, under her bra, around the rim, and that her hands were placed by the deputies through her hair, with their fingers as if a comb to check very thoroughly, and that in between her toes were searched. That is, to me, a physical strip search. And I think that there aren't any cases on this. No, I don't have a case on that because I think this is a unique set of facts that we have here. And the reason it was a unique set of facts is because of the particular circumstances. And that is the two female deputies were going into the bathroom to do the strip search and they were held back by Sergeant Bonilla, who was standing there, and then they were placed in a predicament as young deputies who would say, you know, they were ordered to do a strip search for contraband, but they can't strip her out there. They even say that in the memo. It's a unique set of circumstances. Doesn't that suggest that the law is probably not clearly established as to that unique situation? No, I don't think so because I think what happens at that point is the deputies, by their conduct, are aware now that there's some confusion with regard to what wants to be done. It's not confusion with regard to what the law is. It's confusion as to what Sergeant Bonilla was directing. And so what they did was they did a physical strip search that they believed was more appropriate to the location that the strip search was occurring in. And so instead of making her take all her clothes off, they pushed her dress up and felt underneath essentially her entire body. We have skin-to-skin contact here. And if you look at the strip search categories, you deal with strip searches as visual strip searches, the cases all in the law all says that a digital strip search is more intrusive than a visual strip search, and it's because of the physical touching. So the physical touching of Katie Yasherell is the actual strip search there. And I don't think that it was. I think it was clearly established. Also on your question, Judge Reed, is that what you have are a number of cases that were relied on by the district court, which are in his opinion, and they are Grotke. They're all three criminal cases and one Bivens case. That's Grotke, Moody, Brax, and Bradley. Bradley was the Bivens case, and in that case, it specifically defines, everyone defines in all the cases a pat-down search and in the policies of the Sheriff's Department an over-the-clothing search. That is undisputed. I think that's the law. That's what a pat-down search is. Then the question becomes is, what was this search, as Judge Reimer has indicated? And to me, in that Bivens case, which the district court relied on, it was never disputed in that case that it wasn't a pat-down search. In fact, all of these cases are distinguishable that the district court relied on because they either had some, there was some bulging item that was inconsistent with the anatomy of the person, or in that case, it was they had done a pat-down. Every single case, they did the pat-down first, and then, much like the Plain View Doctrine, they felt something, and then they went to a more intrusive search. This case, they never did that. They did the strip search immediately. And what's important in the Bradley case is that they specifically said, although that case isn't binding on this court, that this, their opinion would not foreclose the possibility that a pat-down could become so intrusive as to require the application of reasonable suspicion. And I think that gets to the heart of the matter and what Judge Reimer is asking about. Is this a case which requires reasonable suspicion? And I would submit to the court that based on the nature of this search, what you're dealing with is a search that is much closer to a strip search, and it's our opinion that it is, in fact, a strip search, a physical strip search, than it is to a pat-down. Now, what I also would say is that the court does not have to decide that this was a strip search in order to rule in the appellant's favor. If the court decides, well, it's not a strip search, it's something less, I still think that there's a requirement of reasonable suspicion because it's not a pat-down search. The only other thing I would say is... It's not a routine pat-down search. It's more intrusive. It's not a pat-down search, and certainly not a routine pat-down search, which our case law says doesn't require reasonable suspicion. It's something that is more intrusive, and I don't know if you need skin-to-skin contact. I don't know if you... Some of the cases seem to say the level of the intrusiveness demands a higher level of articulated suspicion, so I don't know if you go all the way to reasonable suspicion, or if there's some intermediate level of suspicion that is required here. You know, I wouldn't advocate that Judge Ward law, only that I think a bright-line rule is always fair to law enforcement, and if we start having probable cause, reasonable suspicion, and then some lesser standard for this type of search, I wouldn't advocate that because I think that would just be too complicated, frankly. Some of the cases are going that way. But what I think those cases are, Judge Ward law, is this, is they're implementing the Bell v. Wolfish balancing test, and I think that's what they're talking about, the nature of the intrusion, the location, which here was clearly in a public arena where the public was present, and in fact, a person from the deputy from the sheriff's department came upon the search, and there's circumstantial evidence that he observed the search based on his conduct. And the fact that the justification for the search is the other part, that Katie Yasherel, it's important, was leaving the location. And so while I understand that they have a right to do the pat-down at any time you're at the location, the level or the interest that the government had in doing this physical strip search was much less than it would be had she been coming into the location. And I think the balancing test, that's an important factor to consider on the balancing test. I'd like to reserve the balance. I've got a question, a couple of questions to ask. Did Sergeant Bonilla say that this search was in accordance with county policy? Is that in the record someplace? He never used those words. What did he say? The words were when the questions were asked by the appellant of him, why are you searching me, he said two things. One, it was you were observed, he said. His words were you were being seen passing paperwork without knowledge of the staff. That's at ER, the excerpts of Record 24. Then he also said you can be searched at any time while you're here. He was just making that blanket statement. The other question I have is what about the Rule 36 problem? If you want to comment on that. I don't think it's necessary to this opinion. I will be honest with the Court. I probably regret even raising that. I just thought it might have come up. Okay. I don't want to use up any more of your time. Thank you. Thank you. Good morning, Your Honors. I may have pleased the Court to enjoy on behalf of the appellees. I believe this morning Mr. Smith has made two very important acknowledgments. The first one being directly related to the qualified immunity issue. I believe Mr. Smith said in direct response to Judge Reimer's question that there are no cases directly on point as to this issue. This issue being whether or not the conditions or the allegations made by the plaintiff regarding the conditions of her search rose to the level of a search that requires reasonable suspicion. I think that this report recognized that there are no, especially no, Ninth Circuit cases on point. And I think the fact that there are no clearly – there is no clearly established law as to whether or not this situation was one which warranted a finding of reasonable suspicion before the conducting of the search obviously mandates affirmance of the district court's finding that each of the individual defendants were entitled to qualified immunity. The second acknowledgment that Mr. Smith made is that pat-down searches in a jail setting can be made without any reasonable suspicion. I think that's what – Was this a pat-down search? I think based on the plaintiff's allegations, which are aptly set forth in the record, I believe that this was closer to a pat-down search if you consider the most pertinent cases on the issue. For instance, the Bradley case that Mr. Bradley – Didn't your own policy say that a pat-down search is patting down outside the clothing? And in this case, we had going inside and underneath and – Well, I think there were extenuating circumstances regarding – well, first of all, the policy does say that. Okay. So this wasn't a pat-down search according to your policy? Well, I don't think it was a routine pat-down search in accordance to the Sheriff's Department's policy. I think what's pertinent is it was a pat-down search in accordance with the case law. But before I get to that, the Sheriff's Department's policy also says that a strip search requires visual inspection of essentially the naked body, and that did not occur here. And the Bradley case, which I think is very – provides some very instructive analysis since it's a 2002 case, involves very similar circumstances. The plaintiff in that case alleged that she was searched simply because of her race at the airport at an immigration checkpoint. However, in addition to that basic similarity that she was saying that she was subjected to an illegal pat-down search, the plaintiff in Bradley also was not – happened not to be wearing underwear. And the inspector, when conducting the search – this is the initial search. This wasn't the secondary search. When they did the initial pat-down search, the inspector used her fingers and – to press on her breasts and also insert the fingers into the plaintiff's inner and outer labia. And I think just based on those facts, it's – the intrusiveness of that search was certainly more egregious than the search that's alleged in this case. Yet the Bradley court, the Third Circuit in Bradley, said that that search was not a strip search and that despite the allegations made by the plaintiff, the Bradley court, considering all the different pat-down searches arising from airports, jail settings, et cetera, the Bradley court found that the search in that case was a routine border search which did not require reasonable suspicion. So if you draw a similar parallel between these facts in Bradley and the facts in our case, I believe that the district court correctly found that the search in this case should be classified as a pat-down search. This search seems more objectionable and more intrusive to me than a strip search was simply visual. Here they feel a person's body, which seems in vital places, which seems more objectionable, more like – it's much more objectionable than a pat-down or a visual strip search. What do you think about that? Well, actually, I think the whole – the essence of a pat-down search, especially in the jail setting, is to search for possible contraband. And the contraband can be very small. It could be slips of paper that shouldn't have gotten out of the jail setting. And obviously the use of the word pat-down means that there's going to be physical touching. And in order to – But on the outside of the clothing is a lot different than reaching up under the person's outer garments. Well, I think there's a – obviously there's a factual discrepancy there. But it is also in dispute in the record that the plaintiff was wearing an ankle-length skirt, which prevented – and this is based on the plaintiff's allegations as to how the search was conducted. The ankle-length skirt prevented Deputy Vance from actually doing a proper pat-down search of the areas where contraband could possibly be concealed. So then you're admitting there wasn't a pat-down search. I mean, you're using it both ways. You're saying we couldn't do a pat-down search because you had a long skirt on. I think what I'm trying to make clear is that in – But this was something more – I think you have to concede that this was something more than a pat-down search. I think based on – or due to the fact that the plaintiff was wearing the type of apparel she was wearing and based on the plaintiff's allegations as to what the search entailed, yes, it is more than an ordinary pat-down search. Yet, in terms of analyzing it under 1983 law and whether or not there was a Fourth Amendment violation, if you look at all of the print cases, including Bradley – All right. You keep relying on Bradley. But Bradley said we do not foreclose the possibility that a pat-down gone awry could become so intrusive as to become a nonroutine search requiring application of the reasonable suspicion standard. That's true, Your Honor. That's exactly what Bradley said. Don't you think this was a pat-down search that went awry? I would – with respect, Your Honor, I would disagree, especially if you compare the facts of Bradley where they found that the search there was not – did not rise to the level of a strip search or something that required reasonable suspicion. There you had entry of the fingers of the inspector into the private parts of the plaintiff. You did not have that here. And I think you can draw – you know, find distinctions on factual grounds between one search and the next. I'd hate to see a constitutional rule that depended on touching the vagina versus entry of the vagina or touching of the breasts and running your fingers all around them versus I don't know what. But, I mean, I don't think that's really – it's whether or not it's a routine pat-down search or whether it's gone so far beyond because of the level of intrusiveness that you need something more. Well, my response to that, Your Honor, is that notwithstanding the intrusiveness of the search in the Bradley case, the Court still found that it was a routine pat-down search which did not require reasonable suspicion. And going beyond the question of whether the district court was correct in finding that this was a pat-down search that did not require reasonable suspicion, I think the discussion by – or the absence of discussion by the plaintiff in their briefs or in her briefs, that includes any cases that would suggest that this – that the district court erred by, one, finding that the search was a pat-down search, and, two, that the law was not clearly established as to whether or not the facts in this case gave – elevated the search into a strip search that required reasonable suspicion. I think there is no real dispute that Mr. Smith essentially admitted it today, which is there is no clearly established law that would mandate a finding that what the deputies did in this particular case constituted a strip search that required reasonable suspicion. I think the cases, most of them from outside the Ninth Circuit, generally hold that just because you have some physical contact between the searcher and the person being searched in generally private areas, that does not necessarily raise it to the level of a strip search. And I think what's also important to note is that in those cases where they did find a strip search, the circumstances were a lot more egregious and a lot more invasive than the situation here. In those other kinds of cases, you had actual, you know, entry, digital entry into body cavities. You had visual body cavity inspection. Maybe there's a little difference. It seemed to be touching the private parts or inserting your fingers into the person is a pretty close call. Either one is objectionable, certainly. I don't think there's a very effective way to draw the line. Comment on that, please. And I don't indicate my own opinion. I want to test that. Well, I think in terms of if you're focusing on the, if you're taking a woman as an example, if you focus on the woman's breast area, if you're doing any normal pat-down search, whether you're a man or a woman, I think that area of the body is going to get tatted down because that is an area where contraband, whether it's weapons, drugs, or whatever, can be hidden. And there's a factor in this particular case with regard to the alleged contact between Deputy Matt's hand and the plaintiff's vaginal area. That contact would not have happened or may not have happened had the plaintiff informed the deputy that she was not wearing any underwear at the time of the search. It's not disputed that she did not, and presumably had she been wearing underwear, there would not have been the alleged offensive or alleged contact between the deputy and the plaintiff's vaginal area. So, and I think ---- That search, according to the sheriff's manual, is patting the outside clothing. Isn't that right? I think that is a general definition, Your Honor. And I think Judge Reimer, at the very beginning of this argument, aptly noted that this search is somewhere, as it's alleged, is somewhere between a completely normal pat-down search and a bona fide strip search. And the sheriff's department's policy also, as I said before, does state that a strip search requires visual inspection. And that simply did not occur here. And Mr. Smith's argument about, well, they were going to go to the bathroom, but they decided not to, to me that would suggest that, in fact, they decided not to do a strip search. Because I believe his suggestion is ---- The women deputies were headed into the bathroom, but Sergeant Bonilla said no. Well, that's ---- And then she was having her clothes pulled up and hands run up her legs and everything in a public place. Well, I would ---- It's even more of an egregious ---- I would dispute that the record establishes that the search took place in a public place. It took place in an L-shaped hallway, which leads into the main lobby of the Mid-Central Jail. It does not ---- it did not take place in the main lobby. And I don't think there's any evidence in the record to suggest that this was a search that was conducted out in the open public where everybody can witness the search. I just believe ---- I don't believe that's supported by the record. I just ---- and I believe it's simply inaccurate. But ---- Can I ask you another factual question? She brought these papers in, and she told Sergeant Trujillo that some of them were private papers, and she let him look at them. And he said, you're going to have to take those and mail them. Okay? So Sergeant Trujillo then said she didn't give him anything and couldn't give him anything, right? So she's leaving. So the only ---- so what was the contraband since she's leaving and clearly not giving him anything? Whatever she had was not contraband. So what was the purpose of the search? I think the purpose of the search was a function of Sergeant Bonilla being as of a jail setting. But she was leaving. So whatever documents might have been there were not contraband. Well, I don't ---- just using ---- looking at this from a more broader standpoint, a broader viewpoint, I don't think necessarily just because someone who was visiting a jail and is leaving, once that person makes a decision to leave, that person may have nothing that they shouldn't have. It's always possible that something could have been transferred, whether it's from another inmate or someone else at the jail to the person leaving the jail. Trujillo was there watching this whole thing. And he didn't say that there was anything that went between them. Custody Assistant Trujillo made various different observations regarding the visit and past series of visits between the plaintiff and the inmate. And at this particular visit, the very beginning of it, it was clear to ---- they both made it to Mr. Trujillo that they had initially wanted to exchange certain materials that they weren't supposed to. And they knew about that rule. Trujillo said no. Correct, Your Honor. So they didn't. And Mr. Trujillo, I think, out of an abundance of caution, reported his various observations, which are made clear in the record, to the sergeant. And the sergeant, out of an abundance of caution, made the determination that, well, why don't we go ahead and do a search of the plaintiff. And I think under the well-established line of cases that afford jail and prison officials broad discretion in making those kinds of decisions regarding potential safety and security concerns at any jail. And, you know, we've had inmates escaping from various prison facilities within the last few months all over the country. So it's obviously not a ---- It wasn't an inmate. So she wasn't someone trying to escape. I don't think that helps. Well, I guess the point I'm trying to make, Your Honor, is that the decision made by Sergeant Bonilla should be afforded much discretion. And what's more, I think, more relevant is that whole discussion about the plaintiff regarding what Mr. Trujillo observed and what Sergeant Bonilla did, that goes to whether or not there was reasonable suspicion to conduct a strip search. But I don't think we even get to that issue of assessing the observations and conclusions reached by Sergeant Bonilla and Mr. Trujillo unless the Court actually finds that this was a strip search for which reasonable suspicion was required. And I don't think the case law would support that finding, or at the very least the district court's finding that the law is not clearly established as to when a strip search is not clearly established. I think the district court made a correct finding in that regard. And that finding, in addition to the district court's initial finding ---- It's a little bit hard to buy the proposition that they tried to pass contraband. The officer, Trujillo, didn't see them trying to sneak something to the other person. And each side, the person who was the inmate said, here's what I want to give to Ms. Yasherell. And Ms. Yasherell said, I'd like to give these things here. I have the card from the defendant's father to give. And so there was a full disclosure. It didn't look to me like there was any attempt to try to pass contraband. The officer said, no, you can't do that. Do you want to argue to that? Well, I think Mr. Trujillo did more than just report to Sergeant Bonilla about their bringing of materials that they shouldn't have brought to the visiting area. I think he made other observations, combined with observations that he made regarding the visits between the plaintiff and the inmate over the past months prior to that, which made him somewhat suspicious that the visit was more personal rather than professional in nature. And that's the judgment call that Mr. Trujillo made, and it was also a judgment call that he made in reporting his conclusions and his impressions to Sergeant Bonilla. And I think Sergeant Bonilla's decision to go ahead and have two female deputies conduct a search for contraband of the plaintiff inside a facility where everybody is put on notice that they're subject to search at any time, I don't think those facts give rise to the basis for a constitutional violation. And going back to the search itself, the plaintiff below and in her briefs before this Court has consistently been a professional basis for passing the greeting card from the defendant's child to the defendant to sort of establish some sort of relationship with the plaintiff. So I don't think Mr. Trujillo was in a position to draw any broad conclusions as to the motive or the purpose of every single document that they brought. I think there is a general rule that unless it's purely legal materials, the other kinds of documents need to be sent through the jail mail system for obvious security reasons. And ‑‑ Don't let me use up all your time. You're nearly out of time. I notice that, Your Honor. And I just wanted to finish up the point that I was making, which was the search that the plaintiff alleged happened involved some touching that is not part of a normal garden-variety pat-down search. However, the search with these very same allegations, I don't believe, based on all the applicable case law and case law since this incident. The Bradley case was in 2002, 10 months after this incident. I don't think any of these cases would suggest that the district court erred in finding that this was a pat-down search, where other similar cases involved just as or more law enforcement personnel and the person being searched. But on top of that, obviously, the absence of any law that demonstrates that the district court erred in that finding would also necessarily support the finding that ‑‑ or support the finding that the district court ‑‑ the finding that each of the individual defendants went to a qualified meeting. Thank you. Thank you very much. There's, I think, four points that I'd like to make. First of all, with regard to the Bradley case, respectfully to counsel, I think that my reading of Bradley is significantly different from his, and I think that there's some inaccuracies in what he's saying. First of all, in that case, it was never disputed by the Bivens plaintiff that it was a pat-down search. The court specifically recognized that the plaintiff did not claim that that was a strip search and always conceded it was a pat-down search. So for counsel to state that that court found that it was a pat-down search is not accurate. If they said anything, and I don't remember them making any finding of that nature in the Bradley case, it's important to note that even if they did, it was dicta because it was never briefed and it was never an issue in the case. So that's important. Secondly, he made the statement that they actually went into the private parts in the Bradley case. And the court will specifically remember reading in Bradley that they said that they did not. They went on the outside of the private parts and it was over the clothing. But again, it was never litigated as to whether or not that context was a strip search. With regard to contact and the search of Ms. Yasherell, if she had been wearing the underwear, based on what they did in the balance of the search, they certainly would have gone inside the underwear the same way they did the shirt, the same way they did the blouse, excuse me, the pants or the skirt, and the same way they did the bra. Now, with regard to the genuine issues of material fact here in this case, I want to point something out to the court. Trujillo gave a declaration in this case where he said that he saw items being passed or words to that effect. At his deposition at ER Excerpts of Record 238, he was asked specifically about that declaration and he contradicted his declaration. He says, you know what, essentially my declaration is inaccurate. In other words, it's 180 degrees from what the truth was. He said specifically at Excerpts of Record 238 there was no evidence that the plaintiff or the appellant tried to secretly pass anything either way, or there was no reason to believe any contraband had ever been exchanged. My final point would be with regard to the qualified immunity issue. On qualified immunity, it is not the courts have held that you don't have to have every factual scenario in order to have a clearly established law, and I think that's clear here. Thank you. Kagan.
judges: Rymer, Wardlaw, Reed